**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

IN RE FLOWERS FOODS, INC.  :
SECURITIES LITIGATION   :  CASE NO.: 7:16-CV-222 (WLS)
           :
           :
_____ :

## ORDER

Before the Court is Defendants' Motion to Dismiss the Consolidated Class Action Complaint (Doc. 62), Plaintiff's Motion to Take Judicial Notice (Doc. 64), and Defendants' unopposed Motion for Hearing on the Motion to Dismiss (Doc. 66).  For the reasons stated herein, Defendants' Motion to Dismiss (Doc. 62) is **GRANTED-IN-PART** and **DENIED-IN-PART**; Plaintiff's Motion to take Judicial Notice (Doc. 64) is **GRANTED**; and Defendants' unopposed Motion for Hearing on the Motion to Dismiss (Doc. 66) is **DENIED**.

## PROCEDURAL BACKGROUND

On August 12, 2016, Chris Hendley filed a class action complaint in this Court alleging the defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act"). (Doc. 1.)  On October 21, 2016, Judge Schofield in the Southern District of New York consolidated Hendley's action with another action, and appointed Walter Matthews ("Plaintiff") as lead plaintiff and his firm as co-lead counsel.  (Doc. 24.)  The consolidated action was transferred to this Court on November 29, 2016 based on the Parties' joint motion to transfer venue pursuant to 28 U.S.C. § 1404(a).  (Docs. 33, 36, & 37.)  This Court entered a case schedule setting deadlines for the filing of a consolidated complaint, an answer or motion to the complaint, an opposition to the motion, and a reply, with which the Parties complied.  (Doc. 43.)  Matthews timely filed an Amended Consolidated Class Action Complaint on January 12, 2017 against Flowers Foods, Inc., George E. Deese, Allen L. Shiver, R. Steve Kinsey, and Karyl H. Lauder (collectively the "Defendants").  (Doc. 56 (the "Amended Complaint").)  On March 13, 2017, Defendants timely filed a Motion to Dismiss

the Amended Complaint for failure to state a claim.  (Doc. 62.)[1]  On May 12, 2017, Plaintiff timely filed a Response to Defendant's Motion to Dismiss.  (Doc. 63.)  On the same date, Plaintiff also filed a Motion for Judicial Notice of certain documents in support of his opposition to Defendants' Motion to Dismiss.  (Doc. 64.)  On June 12, 2017, Defendants timely filed a Reply to Plaintiff's Response.  (Doc. 65.)  On the same date, Defendants filed a Motion for Hearing on the Motion to Dismiss.  (Doc. 66.)  Plaintiff filed a Notice of Non-Opposition to Defendants' Motion for a Hearing.  (Doc. 67.)  Accordingly, the aforementioned pending Motions (Docs. 62, 64, & 66) are ripe for the Court's review.

## FACTUAL BACKGROUND[2]

Flowers Foods, Inc. ("Flowers" or the "Company") is a food company based in Thomasville, GA.  (Doc. 56 ¶¶ 2, 19.)  Flowers operates two business segments: a direct-store-delivery segment (the "DSD Segment") and a warehouse-delivery segment (the "Warehouse Segment").  *Id.* ¶ 2.  Within the DSD Segment, Flowers relies on independent distributors to deliver packaged bakery foods to its retail and foodservice customers (primarily grocery stores, mass retailers, and fast food chains) throughout the country.  *Id.* ¶¶ 2-4.  The number of distributors for Flowers has grown from approximately 4,100 at the end of 2012 to 5,100 at the end of 2015.  *Id.* ¶ 4.  Flowers has approximately 600 territories for which the distribution rights are available for sale and an additional 230 company-owned and operated territories for which the distribution rights are not available for sale.  *Id.* ¶ 3.  The distributors pay Flowers for exclusive rights to operate in a territory where they distribute certain bakery food brands owned by Flowers.  *Id.* ¶¶ 4-5.  These brands include Nature's Own ("the #1-selling bread brand in the U.S"), Wonder, and Tastykake.  *Id.* ¶ 27.  The distributors "purchase the bakery products from Flowers subsidiaries and, in turn, sell the products to retailers."  (Doc. 62-1 at 14.)  In their respective territories, "[d]istributors are responsible for ordering products,

---

[1] On January 27, 2017, the Court granted the Parties' Joint Motion for Leave to File Excess Pages for Motion to Dismiss Briefing.  (Docs. 59 and 60.)  The Court notes that the Motion to Dismiss, Response, and Reply (Docs. 62-1, 63, & 65) could be viewed as technically exceeding the page limitations permitted by the Court. (*See* Doc. 60.)  But, because the substantive content of each brief was within the permitted page limitations and neither Party objected to any brief as exceeding the page limitations, the Court finds that the Parties were not prejudiced by the excess pages filed and will give due consideration to each brief.

[2] Because the Court will assess the sufficiency of Plaintiff's claims under a motion to dismiss standard, these facts are taken as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

stocking shelves, maintaining special displays, [] visiting customers frequently to ensure adequate inventory[,] and removing unsold goods." (Doc. 56 ¶ 4.) "Distributors can use their own vehicle or lease Flowers' trucks at a cost." *Id.* ¶ 5.

The DSD Segment is at issue in this litigation because the independent distributors which this segment uses are classified by Flowers as "independent contractors" rather than employees. (Docs. 56 ¶¶ 33-35 & 62-1 at 14-15.) Distributors began filing suit under the Fair Labor Standards Act ("FLSA") as early as 2007, but these suits were sporadic until 2015 to 2016, when twenty-four additional lawsuits were filed by distributors against Flowers. (Doc. 62-1 at 14-15.) Generally, the lawsuits allege that the distributors have been misclassified as independent contractors and that they are owed overtime pay, benefits, and other compensation that is available to employees. *Id.* On August 10, 2016, Flowers announced that it was scheduled for a compliance review with the Department of Labor ("DOL") under FLSA. (Docs. 56 at 33 & 62-1 at 16.) The same day, "Flowers' stock price fell $1.60 per share, or 9%, to close at $16.15 per share on August 10, 2016, on unusually heavy trading volume." (Doc. 56 ¶ 8.) The next day, after Defendants Allen Shiver and Steve Kinsey discussed "the Company's second quarter 2016 results, the DOL compliance review, the Company's increased legal costs, and the Company's distribution model," "Flowers' stock price fell another $1.20 per share, or 7.4%, to close at $14.95 per share on August 11, 2016, on unusually heavy trading volume." *Id.* ¶¶ 10-11. The following day, this lawsuit was filed. (Doc. 1.)

"Around 1983, Flowers began re-classifying the employee delivery drivers of its then-approximately 40 bakery subsidiaries as independent contractor 'distributors.'"[3] (Doc. 56 ¶ 33.) Over the next several years, Flowers converted many of its delivery routes to independent distributor routes. *Id.* Currently, the DSD Segment generates 84% of Flowers' sales, while the Warehouse Segment generates only 16% of Flowers' sales. *Id.* ¶ 27. Through the DSD Segment, Flowers' access to the U.S. Population has grown from approximately 38% in 2003 to approximately 85% in 2015. *Id.* ¶ 31. Although Flowers classifies the distributors as "independent contractors," Flowers controls the distributors' work in many ways, including:

---

[3] Flowers alleges that it began using distributors in the 1980s "to provide better service to customers through a program that independently motivates distributors and offers an entrepreneurial opportunity." (Doc. 62-1 at 14.)

- Retaining the ability to have distributors immediately perform terms of their uniform distribution agreements;

- Unilaterally setting the terms and prices for sale of the Company's goods;

- Requiring that distributors use specific equipment or accounting systems,

- Requiring that Flowers approve distributors' sales of routes, advertising, and writing on vehicles;

- Retaining the right to direct when and how distributors service stores and deliver or pull products.  *Id.* ¶ 32.


Jimmy Woodward joined Flowers in 1985 as a Tax Manager and served as Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), and Senior Vice President of Flowers from 2000-2007.  (Doc. 56 ¶¶ 25, 36.)  Woodward chose to testify on behalf of distributor plaintiffs and was deposed in *Rehberg et al. v. Flowers Foods, Inc. et al.*, W.D.N.C. Civil Action No. 3:12-cv-596 (the "*Rehberg* Action"), a class action filed by Flowers distributors in 2012 challenging Flowers' misclassification of the distributors as "independent contractors." *Id.* ¶¶ 25, 52.  According to the *Rehberg* plaintiffs, "Flowers' former CFO repeatedly warned Flowers' senior management and board about the risks of classifying its distributors as independent contractors. . . . Flowers' senior management is well aware that the distributors work more than 40 hours per week." *Id.* ¶ 37.  Woodward also convinced Flowers to consider the distributors as "statutory employees" so that Flowers would not owe back FICA and unemployment tax.  *Id.* ¶ 45.  A January 22, 2016 analyst report authored by Lorem Ipsum Partners (the "LIP Analyst Report") explained that according to Woodward, the point of the distributor program and pride of Flowers was that it could avoid paying employee benefits, such as overtime, to the distributors.  *Id.* ¶ 47.  The report also stated that when Flowers learned that the IRS was going to rule adversely on its application for a private letter ruling regarding its classification of workers as independent contractors, Flowers withdrew the application before the IRS could issue an adverse ruling.  *Id.* ¶¶ 43-44.  The report also contained a legal opinion prepared by the Littler Mendelson law firm which reviewed documents and information based on a call it had with Woodward and detailed its findings

4

and conclusions regarding the same (the "Littler Memo").  *Id.* ¶¶ 49-50.  According to the Littler Memo:

- Flowers retains control over which routes are added to or removed from a territory, and that if distributors resist such changes, their resistance is treated as a breach of contract.

- Flowers has approximately 500 routes that are serviced by its employee "sales managers" and "territory managers," who also complete deliveries for distributors who fail to show up or are otherwise unable to complete their routes.

- "Most distributors are unsophisticated, with little to no prior delivery experience or specialized training, and have not obtained any education beyond high school."

- Distributors either purchase old delivery trucks from Flowers, or Flowers assists them with the paperwork for leasing their own vehicle.

- Most distributors do not advertise their independent business to the public, and many drive trucks advertising Flowers' products, for which no advertising fee is paid.  The Distributor Agreement prevents distributors from delivering "competitive products" for others.  Distributors must often work 6 to 7 days per week for Flowers to make a profit.  (*Id.* at 19-21.)

The Littler Memo concluded that "Flowers distributor model presents a large number of weaknesses that . . . would make defense against any misclassification lawsuit particularly difficult.  Further, . . . the Company faces a long, uphill battle, without any prospect of quick or cost-effective long-term solutions."  (Doc. 56 ¶ 51.)  According to its agreements with distributors, Flowers generally purchases territories back from distributors who terminate their relationship with Flowers and operates them until reselling those territories to new independent distributors.  *Id.* at 40.

In this action, Plaintiff alleges that the Defendants defrauded Flowers' shareholders by making materially false or misleading misrepresentations and omissions that caused financial

losses to the shareholders.  (Doc. 56 ¶ 80.)  Plaintiff alleges that Defendants knew the statements were materially false or misleading, and that Flowers' knowledge is imputed from its senior managers and executives.  (*Id.* ¶ 82.)  Plaintiff asserts that Flowers made these misrepresentations and omissions beginning on February 7, 2013 and ending on August 10, 2016 (the "Class Period"), and Plaintiff brings this action on behalf of all persons and entities that acquired Flowers stock during the Class Period and who were damaged thereby (the "Class").  *Id.* ¶ 300.  Plaintiff asserts that Flowers created "a misleading picture of the Company's business and prospects" which resulted in Flowers securities trading at artificially inflated prices throughout the Class Period.  *Id.* ¶¶ 306 & 328.  Plaintiff contends that the price of Flowers securities declined when its misrepresentations and omissions and the effects thereof were revealed, causing the investors' losses.  *Id.* ¶ 309.

Defendants move to dismiss the Amended Complaint for failure to state a claim and failure to plead fraud with particularity.  (Doc. 62.)

## **DISCUSSION**

Federal Rule of Civil Procedure 12(b)(6) permits a party to assert by motion the defense of failure to state a claim upon which relief can be granted.  A motion to dismiss a plaintiff's complaint under Rule 12(b)(6) should not be granted unless the plaintiff fails to plead enough facts to state a claim to relief that is plausible, and not merely conceivable, on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Dismissal for failure to state a claim is proper if the factual allegations are not 'enough to raise a right to relief above the speculative level.'"  *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (quoting *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008)).  "Stated differently, the factual allegations in the complaint must 'possess enough heft' to set forth 'a plausible entitlement to relief.'"  *Edwards*, 602 F.3d at 1291 (quoting *Fin. Secs. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007)).

In a securities fraud action, the plaintiff must also meet the heightened pleading requirements of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  The PSLRA requires a plaintiff to specify each statement or omission alleged to be misleading, the reason(s) why the statement or omission was misleading, and the

particular facts surrounding the alleged misrepresentation. 15 U.S.C. § 78u-4 *et seq.*; *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1362 (N.D. Ga. 2005).  Further, "with respect to each act or omission," the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2). Specifically, "the complaint must allege facts supporting a strong inference of scienter 'for each defendant with respect to each violation.'"  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (citation omitted).

The Amended Complaint must also allege each element of a cause of action under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder, which are: (i) a material misrepresentation or omission; (ii) made with scienter; (iii) in connection with the purchase or sale of a security; (iv) on which Plaintiff relied; (v) which was causally connected to; (vi) Plaintiff's economic loss.  *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 789 (11th Cir. 2010) (hereinafter "*Goodman*"); *Mizzaro*, 544 F.3d at 1236-37.

The Supreme Court instructs that in considering a motion to dismiss "a court must accept as true all of the allegations contained in a complaint."  *Iqbal*, 556 U.S. at 678.  This principle, however, "is inapplicable to legal conclusions," which "must be supported by factual allegations."  *Id.* at 679 (citing *Twombly*, 550 U.S. at 555, for the proposition that courts "are not bound to accept as true a legal conclusion couched as a factual allegation" in a complaint). Thus, a "court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences from these facts in favor of the Plaintiff[]."  *Bryant v. Apple S., Inc.*, 25 F. Supp. 2d 1372, 1375 (M.D. Ga. 1998) (overruled on other grounds).

## I.   Plaintiff's Motion for Judicial Notice

Plaintiff moves the Court to take judicial notice of nine documents and excerpts of documents filed by Flowers with the SEC.  (Doc. 64.)  Specifically, Plaintiff requests that the Court take judicial notice of facts in Flowers' SEC filings that establish the tenure of certain members of Flowers' Board of Directors.  (Doc. 64 at 3) (referencing Docs. 63-2, 63-6 through 63-10).  Plaintiff also requests the Court to take judicial notice of Flowers' 10-K filings filed

for fiscal years 2015, 2002, 2003, and 2004, but not for the truth of the matters asserted therein. (Doc. 64 at 3-4) (referencing Docs. 63-2 through 63-5).

"'[A] court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed.'" *Kadel v. Flood*, 427 F. App'x 778, 780 n.1 (11th Cir. 2011) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)).  This is because courts may take judicial notice of facts that are "not subject to reasonable dispute." Fed.R.Evid. 201(b).  Because "SEC filings are generally recognized as the most accurate and authoritative source of public information about a company," when they are used "only to determine what statements or disclosures are actually contained therein, there can be little question as to [their] authenticity" or whether they were publicly filed.  *Bryant*, 187 F.3d at 1278.

The Court is aware that many of the documents filed as exhibits to Plaintiff's response were filed well before the class period, such as the 10-Ks filed for fiscal years 2002-2004. (Docs. 63-3, 63-4, & 63-5.)  Nonetheless, the Court may consider these filings if they are relevant at the motion to dismiss stage because Flowers filed them with the SEC.  *Bryant*, 187 F.3d at 1276 ("[W]e approve of the . . .practice of judicially noticing relevant documents legally required by and publicly filed with the (SEC) at the motion to dismiss stage.").  Having reviewed the Amended Complaint and motion to dismiss briefing, the Court finds that the exhibits attached to Plaintiff's Response are relevant SEC filings prepared by Flowers and may properly be considered as requested by Plaintiff.  *See, e.g.*, (Doc. 63 at 39 n.29) (citing Docs. 63-3, 63-4, & 63-5 to dispute Defendants' safe harbor arguments).[4]  Plaintiff further argues that the Court should not take judicial notice of forty-two of the forty-six exhibits filed by Defendants in support of their Motion to Dismiss for the truth of the matters asserted therein.[5]  (Doc. 64 at 4-5.)  Most of these exhibits were Flowers' SEC filings and many were

---

[4] The Court will consider the contents of Docs. 63-2, 63-6 through 63-10 as statements made by Flowers.

[5] Although Defendants did not file a response to Plaintiff's Motion for Judicial Notice, they did note in their reply that "[i]n deciding this motion, the Court may take judicial notice of and consider the press release withdrawing the DOL Interpretation." Doc. 65 at 18 n.12 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) for its finding that "courts must consider the complaint in its entirety, as well as other

quoted or relied on in the Amended Compliant and, thus, are properly subject to judicial notice only to determine what statements they contain. As to the press releases and conference call transcripts that Defendants attached, Plaintiff does not object to judicial notice of these documents "to the extent they are quoted or otherwise discussed and relied upon in the Complaint," but objects to them being considered for the truth of the matters they assert. (Doc. 64 at 4-5.) Therefore, as to all of the exhibits attached by the Parties, the Court will only consider them for the statements they contain and not for the truth of the matters they assert, unless otherwise alleged in the Amended Complaint. Accordingly, Plaintiff's Motion for Judicial Notice (Doc. 64) is **GRANTED**.

## II.   Pleading of False or Misleading Statements or Omissions

To sufficiently allege falsity, Plaintiff must "specify each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); *Goodman*, 594 F.3d at 789. "A statement is misleading if in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (internal quotation marks omitted).

Plaintiff alleges that Defendants made various false and misleading statements and omissions throughout the Class Period. Many of these statements were made in or omitted from the Company's public filings and press releases. For example, Plaintiff alleges that the Company's 10-K forms stated that "certain factors that may cause actual results" to differ include "relationships with or increased costs related to our employees, independent distributors and third party service providers." *See, e.g.*, Doc. 56 ¶ 96.[6] Plaintiff argues that by making this statement, Flowers "misleadingly placed its independent distributors in a separate category as its employees, and otherwise failed to disclose that it was misclassifying its employees as independent contractors." *Id.* Plaintiff asserts that the Form 10-Ks, which contained SOX certifications that they were not misleading, were signed by Defendants Deese,

---

sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

[6] Plaintiff quotes the same language from all of Flowers' 10-K forms filed during the Class Period. *See id.* at 66 ¶ 160 (Flowers' Fiscal 2013 Form 10-K), 91 ¶ 213 (Flowers' Fiscal 2014 Form 10-K), and 117-18 ¶ 269 (Flowers' Fiscal 2015 Form 10-K).

Shiver, Kinsey, and/or Lauder.[7]  Plaintiff argues that such statements were misleading in their context because while the company boasted the "competitive advantages" of its DSD model, it did not disclose the risks of the model given its misclassification of distributors as independent contractors, for which liability could exceed $1 billion.  *Id.* at 43.  Plaintiff also alleges that Defendants stated in the Fiscal 2012 10-K that it did not view the aggregate amount of notes receivable from distributors, approximately $118 million, "as a concentrated credit risk."  *Id.*  Plaintiff asserts this was misleading because Flowers' former CFO Woodward thought it was a significant problem and stated that Flowers' management knew it could "never lose one of [the] misclassification lawsuits – not one."  *Id.*  Plaintiff also argues that the Company's statement that it was "currently in material compliance with applicable federal, state and local laws and regulations" was materially false and misleading because "Defendants knew, but failed to disclose, that the Company" was not in material compliance with laws requiring that the Company treat and classify the distributors as employees.  *Id.* at 43-44.  Plaintiff also asserts that the Company misled investors "by omitting material information regarding the sustainability of [its] growing financial results, including that the Company had achieved its earnings only by knowingly misclassifying its distributors as independent contractors to thereby reduce labor costs."  *Id.* at 44.  Plaintiff argues that Defendants knew the Company was violating FLSA and other state laws regarding labor standards and that the Company failed to disclose its "labor strategy" of misclassifying distributors to reduce costs, despite touting its "lower workforce-related costs."  *Id.* at 44-45.  Plaintiff further alleges that Defendants misled investors by delaying its disclosure that the *Rehberg* Action had been filed against Flowers because Flowers knew it was intentionally misclassifying distributors and that it was "false and misleading" for the Company to state that it was "remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition, results of operations or cash flows in the future."  *Id.* at 45.[8]

Plaintiff highlights the same and similar statements and omissions made throughout the Class Period and argues that they were materially false and misleading for the reasons just

---

[7] *See, e.g.*, Doc. 56 at 34-35 ¶ 95, 41 ¶ 110, 129 ¶¶ 278(m) & 279, 135.

[8] It appears that these statements were contained in the Fiscal 2012 Form 10-K and some 2013 Form 10-Qs.

explained.  *See, e.g.*, Doc. 56 ¶¶ 121, 132.  In addition, Plaintiff asserts that the Defendants made various other false or misleading statements and omissions.  For example, Plaintiff alleges that the Company gave an investor presentation on September 3, 2013 touting the Company's strong growth and control of labor costs, but failing to disclose the risks presented by its DSD model.  *Id.* ¶¶ 138-39.  Plaintiff alleges that these and other positive statements caused Flowers' stock prices to continue to be artificially inflated.  *Id.* ¶ 140.

Plaintiff also attributes specific misleading statements and omissions to specific Defendants.[9]  For example, Plaintiff alleges that the individual Defendants made the following misleading statements or misleadingly omitted information:

- When asked whether Flowers would continue its traditional business model of "all owner-operators," Defendant Deese responded that it was "very technical and legal" and he couldn't "speculate on the future." *Id.* ¶ 91.  After the first quarter 2013 results, Deese "credited the results to the Company's 'investments in our bakeries and our distribution systems over several decades. . . .'" *Id.* ¶ 116.

- In response to an analyst's question about an acquired business's success, Shiver responded that "the primary reason for that is the strength of our DSD network." *Id.* ¶ 136.  In response to another question, Shiver explained that "step 1" is "our strategy of being the low-cost producer," and that the DSD model complements that strategy. *Id.* ¶ 137.  On a November 7, 2013 conference call, Defendant Shiver stated, "It's important to point out that our direct-store-delivery segment, which is 83% of sales, performed very well in the quarter." *Id.* ¶ 148.  After the second quarter results in 2014, despite cake sales going down, Shiver stated, "Our strategy is solid.  We will grow our Tastykake brand as we leverage the distribution strength of our DSD route structure. . . ." *Id.* ¶ 191.

---

[9] *Cf. In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d 1323, 1330 (N.D. Ga. 1998) (dismissing claims because plaintiffs "failed to attribute specific statements to any specific individual Defendant").

- On a February 6, 2014 conference call, Kinsey forecasted earnings per share to grow 7.7% to 15.4% over the 2013 adjusted earnings.  Doc. 56 ¶ 158.  According to Kinsey, "Earnings growth will be driven by top line growth and cost reduction initiatives, such as improved manufacturing efficiencies. We are forecasting input cost deflation in 2014, however costs related to the employees and facilities are expected to increase year-over-year." *Id.*  On a conference call discussing the first quarter 2015 results, Defendant Kinsey stated that "[l]egal expenses are harder to predict, but I do expect they could be up and down quarter-to-quarter throughout the year."  *Id.* ¶ 233.

Moreover, by alleging that the Form 10-Ks and 10-Qs, which contained SOX certifications that they were not misleading, were signed by Defendants Deese, Shiver, Kinsey, and/or Lauder[10], Plaintiff attributed the misleading statements in the forms to those Defendants.   Under the group pleading doctrine, where Plaintiff has pled the misrepresentations with particularity and the roles of the individual defendants, "group-published information," such as SEC filings and press releases, can be considered the "collective actions of the officers."  *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1019 (11th Cir. 2004) (discussing the group pleading doctrine) (quoting *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987)); *In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d 1342, 1358 (N.D. Ga. 2000) ("[T]he group pleading doctrine is simply a rebuttable doctrine that the contents of company-published documents and press releases are attributable to officers and directors with inside knowledge of and involvement in the day-to-day affairs of a company.").

## A. Defendant's Statements and Omissions as to Flowers' Classification of Distributors

Under Rule 10b-5, Plaintiff must allege that Defendants made materially misleading statements and omissions.  17 CFR 240.10b-5.  A statement or omission is "'material' if its disclosure would alter the total mix of facts available to an investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment

---

[10] *See, e.g.*, Doc. 56 ¶¶ 95, 110, ¶ 278(m), 279, & 135.

decision." *In re Miller*, 12 F. Supp. 2d at 1330 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)).

Plaintiff has alleged that Defendants made various opinion statements that are actionable, such as Flowers stating in its SEC filings that they "believe that [they] are currently in material compliance with applicable federal, state and local laws and regulations." (Doc. 56 ¶¶ 100, 164, 216, 273). Plaintiff has also alleged that Defendants' opinion statements regarding the independence of the distributors and that the distributor lawsuits "do not have merit" are actionable. (Doc. 63 at 29) (citing Doc. 56); *see also* Doc. 56 ¶ 320 (quoting Shiver as stating "Our independent distributors are independent business people. They run their business. They are in charge of their operations. . . . The lawsuits that are in place, we believe, do not have merit. . . ."). Defendants assert that Flowers' classification of distributors as independent contractors is a non-actionable legal opinion because Plaintiff has not "ple[d] facts demonstrating the subjective and objective falsity" of Flowers' statements or omissions as to the legality of its classification of distributors. (Doc. 62-1 at 28-29.)

The Court finds that Defendants' alleged statements that they believed they were in material compliance with the applicable laws and that the lawsuits had no merit was an opinion. *See Belmont Holdings Corp. v. Suntrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1218 (N.D. Ga. 2012). Some courts have held that "statements of opinions or belief 'are actionable only if they are both objectively and subjectively false.'" *Id.* (citations omitted). Indeed, statements about a defendants' belief can be actionable "if it is alleged that defendants did not actually believe" the statement they claimed to believe, "or if defendants had no reasonable factual basis for their belief." *Id.* (citing *In re CIT Grp. Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004). For these reasons, some courts have found that proving scienter and a false statement of opinion "are essentially identical." (Doc. 62-1 at 29) (citing *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004)). As detailed *infra* pp. 22-34, the Court finds that Plaintiff sufficiently alleges scienter because the allegations taken collectively would lead to a reasonable inference that Defendants were at least severely reckless as to the falsity of their statements. Further, Plaintiff specifically alleged that Defendants were intentionally misclassifying distributors to avoid complying with labor laws and that their statement that

13

Flowers was in material compliance with all laws was subjectively false. (Doc. 56 at 36 ¶ 100, 87 ¶ 204). Even though Defendants argue that they had a reasonable factual basis for Flowers' opinion about its legal compliance, Plaintiff has alleged that "Defendants' statements about Flowers' business, operations, and prospects were false and misleading and/or lacked a reasonable basis." *Id.* at 7 ¶ 12.

Moreover, as Plaintiff argues, certain opinions may be actionable because "if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015); Doc. 63 at 29-31. The Supreme Court has held that an investor has cause to complain where an issuer's statement is made "in the face of its lawyers' contrary advice" or "with knowledge that the Federal Government was taking the opposite view" because "an investor expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 135 S. Ct. at 1329. As Plaintiff argues, the Amended Complaint sufficiently alleges (and is supported by the Parties' exhibits) that Defendants were informed by legal counsel that the DSD model was not compliant with franchise laws and that Flowers had learned that the IRS did not agree with Flowers' opinion that routes constituted "facilities" for purposes of qualifying distributors as independent contractors. (Docs. 56 ¶¶ 40, 43-44, & 62-37.)[11]   Plaintiff's arguments are further supported by his allegation that the DOL issued an Interpretation stating that "[i]n sum, most workers are employees under the FLSA's broad definitions" where allegedly 84% of Flowers' sales depended on a workforce composed (at least partially) of independent contractors. (Doc. 56 ¶ 64.) Even though Defendants argue that no court or government agency has ever said that Flowers was misclassifying distributors, Plaintiff sufficiently alleges facts that would allow one to reasonably infer that Flowers was intentionally misclassifying distributors. Moreover,

---

[11] The Court has noted Defendants' argument that the franchise issue allegedly addressed by Jones Day and the IRS's potential opinion as to the tax treatment of distributors are not exactly the same as the employment classification issue which Plaintiff asserts was misrepresented. (Doc. 65 at 10.) Nonetheless, the Court is unpersuaded that they have no bearing on the sufficiency of the Complaint. Both opinions, as alleged by Plaintiff, would have informed Flowers that its distributorships were not materially compliant with the law and that statements indicating legal compliance might be misleading. Although such opinions may not prove the fraud Plaintiff alleges occurred, they are relevant to the Court's determination of falsity. Here, the Court only finds that Plaintiff sufficiently alleges falsity.

Plaintiff sufficiently alleges that Defendants knew the grave risks presented by the distributor lawsuits and misleadingly stated that they had no merit. *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 241 (D. Mass. 2011) (rejecting defendants' argument that statement of opinion as to merit of lawsuit by company's largest client was not actionable or was protected by the PSLRA's safe harbor and denying motion to dismiss such claims finding that such an opinion statement was materially misleading). As in other courts, where Plaintiff has sufficiently alleged Defendants' knowledge that an aspect of the company was at risk, the Court "cannot conclude" that Defendants' subsequent assertions that relevant lawsuits are without merit "are not actionable as a matter of law." *In re Bayer AG Sec. Litig.*, 2004 U.S. Dist. LEXIS 19593, at *40 (S.D.N.Y. Sep. 30, 2004).

Thus, the Court finds that Plaintiff has sufficiently alleged that the challenged opinion statements, including statements that Flowers was complying with the law, were misleading in context because they would "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 135 S. Ct. at 1329. Therefore, the Court is satisfied that Defendants' statements of belief about its legal compliance, the independent nature of the distributorships, and the merit of the lawsuits are actionable.

Defendants also argue that Flowers' statements reporting financial results which Plaintiff admitted were "literally true" but misleading, cannot create liability. (Doc. 62-1 at 31.) The Court agrees. The Eleventh Circuit has already held that "[f]actual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *FindWhat*, 658 F.3d at 1306 (explaining that when a company reports revenue growth, there is no rule that it detail "every aspect of the company's operations that could possibly bear on future revenue") (citation omitted). Thus, Plaintiff's claims that Defendants' accurate statements on past financial data were misleading are **DISMISSED**. *See, e.g.*, Doc. 56 at 44 ¶ 114(d), 50 ¶ 126(c).[12]

## B. Defendants' Omissions about Flowers' Classification of Distributors

Defendants also argue that their alleged omissions are not actionable because they had no duty to discuss the legality of Flowers' classification of distributors. (Doc. 62-1 at 32.) To

---

[12] The Court notes that Plaintiff made no response to Defendants' argument on this point.

sufficiently alleged that an omission was misleading, Plaintiff must "identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 135 S. Ct. at 1332.

It is well established that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17, 108 S. Ct. at 987 n.17. Materiality alone does not create a duty to disclose. *In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d at 1331; *Matrixx Initiatives, Inc.*, 563 U.S. at 44. Moreover, "[t]he Federal securities laws do not impose a duty upon parties to admit publicly they may be violating the law." *Id.* Rather, "[a] corporation has a duty to neutralize only the 'natural and normal implication' of its statements." *FindWhat*, 658 F.3d at 1305 (citation omitted). Therefore, a duty to disclose is triggered when the failure to disclose "could mislead a reasonable investor." *FindWhat*, 658 F.3d at 1298. The Eleventh Circuit has held that "a duty to disclose all material information relating to a particular subject arises by voluntarily 'touting' the subject to investors." *FindWhat*, 658 F.3d at 1299 (citation omitted). But the duty to disclose requires only the disclosure of information that would "alter the total mix of facts available to an investor" such that "'a reasonable shareholder would consider it important' to the investment decision." *In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d at 1330.

Here, Defendants are alleged to have voluntarily touted the benefits of the DSD model as a "competitive advantage," a reason for its acquisitions' success, and as helping the Company to keep costs low. (Doc. 56 ¶¶ 136, 137, & 168.) Plaintiff alleges that "[d]espite repeatedly touting the advantages offered by its DSD system, the Company misleadingly omitted any serious discussion of the existential risks that distributor misclassification presented to the Company's business and prospects." (Doc. 56 ¶ 169.) Plaintiff argues that "once Defendants chose to tout the strengths of [Flowers'] distributer program" and Flowers' material legal compliance, "they had a duty to disclose the full truth about their misclassification strategy, including the adverse legal and IRS opinions." (Doc. 63 at 32.) Taking Plaintiff's allegations as true, the Court finds that Defendants did voluntarily tout the benefits of the DSD model and that their failure to disclose known material problems with

that model was materially misleading.[13] *FindWhat*, 658 F.3d at 1299 (holding that "Defendants' statements triggered a duty to disclose the grave defects that existed within the 'enforce[ment]' system they voluntarily touted").   Although Defendants need not necessarily have disclosed the never-issued IRS opinion or the specific legal advice received, failure to disclose any knowledge of the compliance issues with the DSD segment was materially misleading because such information would "clearly [be] not so unimportant that reasonable minds could not differ as to their materiality." *In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d at 1330 ("A complaint may not be dismissed under Rule 12(b)(6) unless the alleged misstatements and omissions are 'so obviously unimportant to a reasonable investor that reasonable minds could differ on the question of their importance.'") (citation omitted).   Although Defendants provided some general cautionary language about the remote possibility that lawsuits would have a materially adverse financial effect, that language did "nothing to indicate even potential weaknesses" with the DSD model, let alone that Defendants were aware the model was actually not compliant with the law, as alleged by Plaintiff. *FindWhat*, 658 F.3d at 1299.   As it has been held, "[a] duty to speak the full truth arises when a defendant undertakes to say anything." *Id.* (citation omitted).   Having found that Defendants' omissions about the known material risks presented by the DSD model were materially misleading, the Court denies the motion to dismiss Plaintiff's claims as to Defendants' omissions regarding Flowers' distributor classification system.

### C.  Defendants' Forward-Looking Statements

Under the PSLRA's safe harbor, "corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by

---

[13] To be clear, Plaintiff has not merely alleged the *possibility* that the Flowers' distributor classification system could be found unlawful – such an allegation would be insufficient.   *See Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 586 (E.D. Va. 2006) ("[S]ecurities law does not require [Defendant] to accuse itself of wrongdoing."); *In re Miller*, 12 F. Supp. 2d at 1331 (Defendants are not required "to admit publicly they *may* be violating the law.").   But Plaintiff has also plausibly alleged that Defendants knew the distributor classification system was unlawful based on Woodward's warnings and testimony, the legal opinions, and the IRS opinion, among other things, and that therefore, a statement that Flowers was in material compliance with the law was deceptive. *FindWhat*, 658 F.3d at 1299 ("[T]o caution that it is only possible for the unfavorable events to happen when they have already happened is deceit.").   Although it is a close call whether Plaintiff has sufficiently alleged that the omissions were materially misleading, a prudent conclusion based on the cumulative allegations is that he has.

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).[14]   Furthermore, defendants can escape liability if plaintiff fails to prove "that the defendant made the statement[s] with 'actual knowledge'" that they were "'false or misleading.'" *Harris*, 182 F.3 at 803 (quoting 15 U.S.C. § 78u-5(c)(1)(B)).  The PSLRA defines "forward-looking statement" to include a statement or report addressing projected or estimated revenues, earnings, or other financial items, future economic performance, the plans and objectives of management for future operations, and assumptions underlying such statements.  15 U.S.C. § 78u-5(i)(1).  When a forward-looking statement contains assumptions, the statement as a whole may be deemed forward-looking.  *Harris*, 182 F.3d at 807.  The cautionary language accompanying such statements is adequately "meaningful," when it "warn[s] of risks of a significance similar to that actually realized" to put investors "sufficiently on notice of the danger of the investment."  *Id.*  While the caution need not list "*all* factors" that underlie the forward-looking statements, it should "tell[] the reader in detail what kind of misfortunes could befall the company and what the effect could be."  *Id.*

Defendants argue that certain statements made in Flowers' press releases, earnings calls, presentations, and SEC filings are forward-looking statements and protected under the PSLRA's safe harbors.[15]  (Doc. 62-1 at 34.)  Defendants assert that these statements were forward-looking because they "relate to financial projections, management's plans and objectives for future operations, or future economic performance."  *Id.* at 35.  Defendants provide examples of the statements they argue are forward-looking, which include assertions such as "we do anticipate that sales and earnings for 2013 will meet or exceed our long-term objectives" and "[w]hile the company is unable to predict the outcome of these [litigation] matters, it believes that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect on its overall financial condition."  *Id.* at 35-36; *see also id.* at

---

[14] The Court notes that the "bespeaks caution" doctrine has been considered the "judicially created equivalent" of the PSLRA's safe harbor provision. *Bryant*, 187 F.3d at 1276.  But because Defendants did not specifically raise the bespeaks caution doctrine, the Court will not address Plaintiff's claims under that doctrine.
[15] Notably, Defendants do not argue that any of their alleged statements were mere corporate optimism or puffery, so the Court will not address such.

34 nn. 11-14.  The Court accepts that generally these types of statement, which discuss projections and estimations about the Company's future financial performance, are forward-looking.[16]  *In re Columbia Labs., Inc. Sec. Litig.*, 144 F. Supp. 2d 1362, 1368 (S.D. Fla. 2001) ("Even statements that include both forward-looking and non-forward-looking factors must be treated as forward-looking.")

As such, the Court must next determine whether the forward-looking statements are covered by the PSLRA's safe harbors because either (1) they were accompanied by meaningful cautionary language or (2) Plaintiff has failed to allege that Defendants had actual knowledge they were false or misleading at the time the statements were made.  15 U.S.C. § 78u-5(c)(1).

Defendants assert that Flowers' SEC filings contained meaningful cautionary language as part of the "total mix" of information available to investors at the time of any alleged misstatements.  (Doc. 62-1 at 37) (citing *In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1354 (N.D. Ga. 2001)).  In *In re S1*, the court cited a Tenth Circuit case for the proposition that "in 'fraud on the market' cases, 'the relevant inquiry concerns the total mix of information available to the market at the time of the allegedly fraudulent statements.'"  173 F. Supp. 2d at 1354 (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122 (10th Cir. 1997).  Defendants cite these cases to argue that even though all of Flowers' cautionary language was not provided at the time each forward-looking statement was made, the forward-looking statements themselves contained cautionary language and referred investors to the SEC materials for more details on the risk factors.  (Doc. 62-1 at 37.)  For example, Defendants quote a Flowers' press release which stated that "[a]ll forward-looking statements are subject to risks and uncertainties that could cause actual results to differ" and then referred the reader to additional risk factors contained in the Company's most recent annual, quarterly, and other filings with

---

[16] Contrary to Plaintiff's argument (Doc. 63 at 25-26), they are not present and historical fact. As to the other statements which Plaintiff asserts represented present fact (Doc. 63 at 26 n.22), those statements are not forward-looking, and as explained *supra* p. 15, the statements of verifiable fact which Plaintiff conceded are "literally true" are not actionable because they were neither false nor misleading.  However, statements that Flowers was doing well because of the DSD model could be misleading if they omitted material information about known non-compliance or risks posed by the DSD model or were not accompanied by meaningful cautionary language.  Likewise, statements that represent present opinion only about the nature of the distributorships or the merit of the lawsuits are not forward-looking and remain actionable because Plaintiff has sufficiently alleged that they were misleading.  *See supra* pp. 13-15.

19

the SEC. *Id.*[17]  The cautionary language that "forward-looking statements are subject to risks" was not itself meaningful but was a mere boilerplate warning that risks could exist.  *See In re S1*, 173 F. Supp. 2d at 1351 ("[B]oilerplate warnings merely reminding an investor that the investment holds risk are not sufficient.")  Nonetheless, it would also not be reasonable for a prudent investor to rely on a press release or presentation alone, especially where the press release or presentation referred the investor to review the company's filings with the SEC.  Under these circumstances, the Court will consider the "total mix" of material available to investors to determine whether Flowers' cautionary language was sufficiently meaningful.  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122-23 (10th Cir. 1997).

Defendants first cite only the following cautionary language which they assert was in every SEC filing during the Class Period: "factors that may cause actual results . . . to differ materially . . . are discussed in this report and may include . . . unexpected changes to . . . relationships with or increased costs related to our employees, independent distributors and third party service provides; . . . laws and regulations . . . ."  (Doc. 62-1 at 38) (citing Flowers' 2012 and 2015 10-K).  This language is quite vague.  To be shielded by the PSLRA, Defendants must have "specifically tailored" the warnings to the risks Plaintiff argues existed.  *FindWhat*, 658 F.3d at 1299 (citation omitted).[18]  As in *FindWhat*, "the 10-K[s] disclosed nothing to indicate even potential weaknesses" in Flowers' employment classification system.  *Id.* Moreover, as Plaintiff argues, that Flowers had been using the same language in its 10-Ks since 2002 "despite the new information [it] received . . . belies any contention that the cautionary language was 'tailored to the specific future projection.'"  (Doc. 63 at 39) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010)).  As Plaintiff correctly asserts, "Defendants cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings, because such a broad disclaimer fails to alert investors to the specific risks they are facing."  *Id.* at 39-40 (quoting *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 U.S. Dist. LEXIS 54202, at *36 (S.D.N.Y. Apr. 22, 2016)).

---

[17]  Defendants also quote two 2013 Flowers presentations which stated that the presentations contained "forward-looking statements" but that risk factors were detailed in the Company's SEC filings.

[18]  *Cf. Harris.*, 182 F.3d 799, 807 (11th Cir. 1999) (finding cautionary language meaningful because it was "detailed and informative" and "t[old] the reader in detail what kind of misfortunes could befall the company and what the effect could be").

Although the 10-Ks state that the risk factors are discussed in the report, Defendants have not cited any other language in the 10-Ks filed prior to 2015 discussing the specific risks posed by classifying distributors as independent contractors.  As such, the Court concludes that Defendants did not provide meaningful cautionary language to accompany Flowers' forward-looking statements made prior to April 25, 2015.  Thus, the forward-looking statements made by Defendants prior to this date are shielded by the PSLRA's safe harbor only if Plaintiff has not alleged that Defendants had actual knowledge of the statements' falsity at the time they were made.  The Court has already found that Plaintiff did sufficiently allege Defendants' actual knowledge of their statements' falsity, and thus, Defendants' forward-looking statements made prior to April 25, 2015 are not shielded by the PSLRA.

But, Defendants concede that Flowers' cautionary language became more specific beginning on April 25, 2015 with the 2015 first quarterly report.  (Doc. 62-1 at 38.); *see also* Doc. 63 at 37.  Defendants assert that Flowers' 2015 first quarterly report specifically warned that factors that could cause financial results to differ included: "disruptions in our direct-store-delivery distribution model, including litigation or an adverse ruling by a court or regulatory or governmental body that could affect the independent contractor classifications of the independent distributors" and that "[a] material negative change in our relationship with the independent distributors, an adverse ruling by regulatory or governmental bodies regarding our independent distributorship program or an adverse judgment against the company for actions taken by the independent distributors could materially affect our financial condition, results of operations, and cash flows."  (Doc. 64 at 38) (quoting Q1 2015 10-Q, 2, 47.)  Defendants assert that these "specific warnings" put investors on sufficient notice "of the risks Plaintiff alleges materialized."  (Doc. 62-1 at 28.)

The cautionary language in Flowers' 2015 first quarterly report was sufficiently detailed and informative.  It warned of the specific risks that Plaintiff alleges existed: that litigation and regulation as to the DSD model could materially affect Flowers' financial condition.  That is all that is required.  A company need not "explicitly mention *the* factor that ultimately belies a forward-looking statement."  *Harris*, 182 F.3d at 807.  "When an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger

of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.* Plaintiff's argument that "such warnings were rendered meaningless by Flowers' accompanying assertion that 'it believes, based upon currently available facts, that it is remote that the ultimate resolution of any such pending matters will have a material adverse effect'" is unavailing. (Doc. 63 at 38.) This is precisely the type of forward-looking statement for which the PSLRA provides a safe harbor if there is sufficient cautionary language. Plaintiff's remaining arguments on this point are also unpersuasive. Plaintiff has not alleged that the risks that litigation or regulation would have a materially adverse financial impact had yet come to pass. There was no present fact reported in these statements, only present opinion. Moreover, "the defendants' state of mind is irrelevant" if his forward-looking statement "is accompanied by 'meaningful cautionary language.'" *Harris,* 182 F.3d at 803 (citation omitted). Thus, the Court finds that Defendants' forward-looking statements made as of April 25, 2015, the date Flowers filed its 2015 first quarterly report, are shielded by the PSLRA's safe harbor provisions; and therefore, Plaintiff's claims against such statements are **DISMISSED.** [19]

### III.  Pleading of Scienter

Defendants argue that Plaintiff failed to plead scienter, meaning that Defendants acted with "an intent to deceive, manipulate, or defraud, or severe recklessness." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010) (internal quotation marks and citation omitted). Severe recklessness exists when "highly unreasonable omissions or misrepresentations . . . present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Mizzaro*, 544 F.3d at 1238 (citation omitted). Defendants raise several reasons for its argument that Plaintiff has not sufficiently pled scienter, which will each be addressed below.

#### A.  Scienter as to *Each* Defendant and *Each* Alleged Violation

A complaint must create a "'strong inference' of scienter," meaning "an inference that is 'cogent and at least as compelling as any plausible opposing inference one could draw from

---

[19] The Court notes that April 25, 2015 is sufficiently close in time to the end of the Class Period to reasonably be considered part of the "total mix" of information that investors should have considered through the end of the Class Period.

the facts alleged." *Mizzaro*, 544 F.3d at 1238 (quoting *Tellabs*, 551 U.S. at 313).  But, "facts which individually do not give rise to a strong inference of scienter may be aggregated to rise to the necessary showing." *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016-17 (11th Cir. 2004). In determining "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, . . . courts must consider the complaint in its entirety, and omissions and ambiguities count against inferring scienter." *Mizzaro*, 544 F.3d at 1238-39 (internal quotation marks and citation omitted).   As such, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324.  In deciding whether allegations of scienter are sufficient to survive a motion to dismiss, a court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.  In the Eleventh Circuit, scienter is satisfied if Plaintiff creates a strong inference of severe recklessness. *In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d at 1360 (citing *Bryant*, 187 F.3d at 1283).  Conclusory allegations that Defendants knew their statements or omissions were misleading is not sufficient. *Id.* at 1361.  To establish scienter, Plaintiff must identify the specifics of "what the Defendants knew and when the Defendants knew it." *Bryant*, 100 F. Supp. 2d at 1380.  Indeed, "knowledge is the foundation of scienter." *In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d at 1360.

Defendants argue that Plaintiff must not only describe "the 'who, what, when, where, and how' as to *each* statement," but must also "identify[] particular facts showing the speaker possessed information contradicting his public statements" to establish scienter.  (Doc. 62-1 at 19) (citations omitted).  Defendants assert that Plaintiff "relies upon the same vague allegations for all statements," rather than pleading scienter as to each statement, and that Plaintiff presents no direct evidence that each Defendant acted with scienter when making each challenged statement.  *Id.*  Defendants argue that the Amended Complaint does not establish that each Defendant knew their statements were false or misleading but contains only "generalized allegations of collective knowledge," which cannot establish scienter.  *Id.* at 20.

Plaintiff argues that facts probative of scienter were alleged as to each Defendant. Plaintiff's Amended Complaint alleges that Flowers and its directors and officers were warned

numerous times of the risks presented by its employment classification via Woodward, the IRS, analysts, and law firms.  As in other cases, an inference of scienter may be raised when defendants ignore "red flags" warning them that their actions may be fraudulent.  *Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1209-10 (11th Cir. 2001) (citing cases where allegations of violations and ignoring red flags were sufficient to state a claim for securities fraud ); *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2007) (the "implicit assertion that a Company can ignore the elephant in the room, as long as no one *told* them it was there does not negate recklessness") (emphasis in original); *Freeman v. BDO Seidman, LLP (In re E.S. Bankest, L.C.)*, Nos. 04-17602-BKC-AJC, 06-1220-BKC-AJC-A, 2010 Bankr. LEXIS 1288, at *44 (Bankr. S.D. Fla. Apr. 6, 2010) (denying summary judgment in part because "[a] jury could reasonably find that [defendant's] decision to ignore numerous red flags and its repeated violations . . . establishes scienter.").  Further, a defendant's attempts to hide problems may add to an inference of scienter.  *Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*, 847 F. Supp. 2d 1333, 1344 (S.D. Fla. 2012) (finding that concealing defects, coupled with material misstatements, "are a prime example of facts that, taken together, give rise to the inference of scienter").  Here, Plaintiff alleges that Defendants attempted to conceal problems not only when Woodward's superiors threatened to "find another accountant" and told Woodward to "pipe down," but also when Flowers withdrew its request for a determination from the IRS upon learning that the IRS would reach an unfavorable determination.  *See* Doc. 63 at 18-19.  Plaintiff also alleges that Flowers failed to identify the DOL as an agency that regulated the Company's operations "even after the July 2015 DOL Administrator's Interpretation warned companies that 'most workers are employees under the FLSA's broad definitions' and that 'the Department continues to bring successful enforcement actions against employers who misclassify workers.'"  (Doc. 56 at 116.) [20]

Further, Plaintiff alleges that after SOX went into effect, Flowers' distributor coordinator received a legal opinion stating that Flowers' distributor program was not in compliance with franchise laws.  *Id.* at 22 (citing Doc. 56 ¶ 40).  According to the report

---

[20] The Court rejects Defendants' argument that because the DOL interpretation was withdrawn in 2017, it is not probative of scienter.  (Doc. 65 at 17-18 n.12) (citing Doc. 65-3).  Obviously, the withdrawal does not help the Court in determining what Defendants knew during the Class Period which ended in 2016.

discussing that legal opinion, after Flowers' SEC counsel Jones Day agreed that the distributorships were actually franchises, Flowers found another firm to write a new legal opinion that suited Flowers' distributor model.  (Doc. 62-37 at 9.)  As Plaintiff argues, these facts sufficiently allege that Flowers' management had knowledge that its distributor program was violating laws and that yet Flowers concealed that information and misled investors about its legal compliance, present and future success, and the risks posed by the DSD model.  *See* Doc. 63 at 22. [21]

Plaintiff also argues that where Flowers' refused to listen to the Jones Day Opinion and withdrew its request to the IRS for a determination, that is evidence that Flowers' senior management had knowledge of the Company's "improper practices."  *Id.* at 19.  Furthermore, Plaintiff did attribute specific allegedly misleading statements and omissions to each Defendant.  *See supra* pp. 11-12.  These allegations, taken collectively, sufficiently allege facts probative of scienter as to each Defendant.

### B.  The Roles and Responsibilities of the Individual Defendants

While "scienter cannot be inferred merely from a defendant's position," scienter can be inferred when a defendant's position and responsibilities establish other particular facts probative of scienter.  *Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1360 (S.D. Fla. 2015) (citing *Durgin v. Mon*, 415 F. App'x 161, 165 (11th Cir. 2011)).  In *Thorpe*, the court found allegations as to defendants' roles and duties relevant for inferring scienter because they showed the defendants' knowledge of information reflecting true, non-public facts, control over or modification of materially misleading misstatements, knowledge of all aspects of the financial and business operations, knowledge of improprieties at a core operation, and motive for additional compensation.  111 F. Supp. 3d at 1360-62.  Here, allegations that Defendants had access to meaningful and internal reports such as "a legal opinion stating Flowers' distributor program was not in compliance with franchise laws, as well as knowledge of the adverse IRS decision, and notice of Flowers' misclassification lawsuits and the DOL

---

[21] The Court notes that where there are glaring "red flags" of non-compliance, signing Sarbanes-Oxley certifications may support an inference of scienter.  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006*)* (finding that a certifier would be severely reckless if he "had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.").

Interpretation"[22] add to an inference of scienter.  (Doc. 63 at 24.)  As courts before, this Court can reasonably conclude that "one who functions as the chief operating officer of a national company and serves as one of the core members of the senior management group necessarily is provided significant information, formally and informally, about the financial performance, or failure of performance, over which he has overall operational responsibility."  *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1364 (N.D. Ga. 2005) (further explaining that where an officer is "responsible for making statements that appeared in press releases and SEC filings," that "confirm[s] his overall participation in, and responsibility for, management of the Company").

An inference of scienter is bolstered by Plaintiff's numerous allegations indicating that the DSD model was a "core operation" of Flowers.  *See, e.g.*, Doc. 56 at 12 ¶ 27 (the DSD model represented 84% of Flowers' total sales in 2015), 16 ¶ 42 (the independent operator model was a "labor strategy"), 35 ¶ 97 (Company touting its "growth strategy" of converting new acquisitions to the DSD model), 55 ¶ 137 (Shiver stating that "step 1" is ensuring that "bakeries continue with our strategy of being the low-cost producer," which is supported by the DSD model), & 19 ¶ 48 (Flowers' management stating that it can "never lose one of these misclassification lawsuits – not one")[23].  Indeed, these allegations are sufficient to show that the DSD Segment is a core operation of Flowers, and combined with Plaintiff's other allegations, make it more likely that Defendants were aware of the alleged compliance issues posed by the DSD Segment during the Class Period.  *Thorpe*, 111 F. Supp. 3d at 1376 (imputing knowledge of compliance issues posed by an acquisition based on allegations that the acquisition would increase the defendant company's EBITDA by almost five times, would be "a substantial source of revenue," and would significantly increase the defendant's business combined with allegations that the individual defendants "had knowledge of illegal practices").

---

[22] The Court notes that although only the first two types of documents are internal, they all would be meaningful to the Defendants.

[23] Such allegations also suggest a specific motive for Flowers not to disclose the potential illegality of its DSD model, which may also contribute to an inference of scienter.  *Bryant*, 187 F.2d at 1285-86 ("[M]otive and opportunity are specific kinds of evidence, which, along with other evidence might contribute to an inference of recklessness or willfulness."); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1334-35 (S.D. Fla. 2004) (same).

Although Defendants argue that the core operations doctrine has not been adopted by the Eleventh Circuit and runs counter to the PSLRA, Defendants have not argued, and the Court is not aware of any cases stating, that courts in this circuit cannot consider whether the alleged fraudulent activity was a core operation.[24]  The Court agrees that Plaintiff must allege specific facts establishing scienter as to each Defendant, and consistent with that, where the alleged fraudulent activity is the basis of 84% of the defendants' business, such a fact is relevant for the issue of scienter.[25]  *Cf. Mizzaro*, 544 F.3d at 1251 (finding no scienter because "[t]his is not a case where allegedly fraudulent transactions amounted to an overwhelming percentage of the corporation's business" such that the executives should have known about the alleged fraud) (citing *In re Suprema Specialties, Inc. Sec. Litig.*., 438 F.3d 256, 278-79 (3d Cir. 2006) for "concluding that a strong inference of scienter existed where, among other things, the complaint alleged that 'fictitious transactions . . . constituted *more than two-thirds* of the company's revenue'").  After all, a plaintiff may prove fraudulent intent with circumstantial evidence.  *Thorpe*, 111 F. Supp. 3d at 1373.[26]  Thus, under the facts alleged, the Court finds that the Defendants' roles and responsibilities contribute to an inference of scienter.

## C. Woodward's Statements

Defendants also argue that the statements attributed to Woodward cannot establish a "cogent" and "compelling" inference of scienter because "(i) Woodward was not employed at Flowers during the Class Period; (ii) the allegations do not identify—much less detail—any first-hand interactions with the Individual Defendants; (iii) the contentions amount to nothing

---

[24] *See, e.g., City of Pontiac Gen. Emples. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1295 (N.D. Ga. 2011) (considering Plaintiffs' argument that "the alleged misstatements and omissions are 'integral to the Company's 'core operations'"); *Waterford Twp. Gen. Emples. Ret. Sys. v. CompuCredit Corp.*, No. 1:08-CV-2270-TWT, 2009 U.S. Dist. LEXIS 112839, at *22-23 (N.D. Ga. Dec. 3, 2009) (finding with regard to Plaintiff's core operations argument, that "Plaintiff must first allege with particularity that someone at [the Company] actually knew that [the Company's] marketing practices were illegal," and then, "[t]hat knowledge could then be imputed to the individual Defendants."); *Schultz v. Applica, Inc.*, 488 F. Supp. 2d 1219, 1226 n.3 (S.D. Fla. 2007) (imputing knowledge of alleged violations to CEO because where "irregularities are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in day-to-day operation of the company") (citation omitted).

[25] To be clear, the Court is not adopting the "core operation" doctrine to contravene the pleading requirements of the PLSRA.

[26] *See also TSG Water Res., Inc. v. D'Alba & Donovan Certified Pub. Accountants, P.C.*, 260 F. App'x 191, 201-02 (11th Cir. 2007) (concluding in the context of fraud under Georgia law: "Proof of fraud is typically not susceptible of direct proof, and so circumstantial evidence must be used to establish fraudulent intent.")

more than 'common knowledge' allegations; and (iv) the allegations reflect only Woodward's purported opinions." (Doc. 62-1 at 22) (citation omitted). Defendants further argue that because the LIP Analyst Report and Littler Memo "rely entirely on statements from Woodward," they too are not probative of scienter.

As to Defendants' first argument, the fact that Woodward was not employed during the Class Period does not necessarily render his statements unreliable or irrelevant.[27]  In this case, Woodward's statements allege that Flowers and certain executives had knowledge that the DSD model did not comply with all laws and that Flowers had been warned by Woodward and others that the DSD model was problematic.  Such statements are highly relevant to determining what Flowers and its officers and directors knew or should have known during the Class Period.  *Thorpe*, 111 F. Supp. 3d at 1374.  Moreover, such statements are relevant because they "are similar to the events that occurred during the Class Period, which plausibly suggest a long standing course of misconduct extending into the Class Period." *Id.*; *see also In re: BofI Holding Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC, 2016 U.S. Dist. LEXIS 132574, at *30-31 n.5, 2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) (finding testimony from a former employee relevant because "Plaintiffs allege that defendants engaged in a pattern of misrepresenting and misleading investors over a number of years").  Unlike in the cases cited by Defendants, Plaintiff specifically alleges Woodward's managing role as CFO and his personal knowledge of and involvement with the DSD Segment.  Therefore, his statements are not rendered irrelevant merely because Woodward was not employed during the Class Period.

As to Defendants' argument that Woodward never identified any direct interactions with the individual Defendants, this "is not fatal" to Plaintiff's securities fraud claims "because circumstantial proof will suffice." *Thorpe*, 111 F. Supp. 3d at 1373.  The Court must determine

---

[27] The cases cited by Defendants on this issue are inapposite to the facts here.  *See In re Winn-Dixie Stores*, 531 F. Supp. 2d 1334, 1338 (M.D. Fla. 2007) (finding statements of anonymous former employees unhelpful because they discussed how "management initiatives impacted their work" and not "what Defendants actually knew at the time [the] challenge representations were made"); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (finding that confidential witnesses who were not employed during the time period were not reliable because they had only secondhand information); *Wachovia Equity Sec. Litig. v. Wachovia Corp.*, 753 F. Supp. 2d 326, 352 n.17 (S.D.N.Y. 2011) (taking issue with statement by a confidential witness employed after the date in question, but still finding "such errors not dispositive").

"whether a reasonable person would infer, based on the circumstances alleged in the []
Amended Complaint, that there was at least a fifty-fifty chance that each of the [] Individual
Defendants knew about the alleged fraud or was severely reckless in not knowing." *Id.* For
the reasons explained herein, the Court concludes that there was such a chance.

Here, Plaintiff argues that where Woodward "'repeatedly warned Flowers' senior
management and Board about the risks of classifying its distributors as independent
contractors,' but was 'told to pipe down,' such statements could only come from the CEO or
the Board." Doc. 63 at 18 (quoting Doc. 56 ¶¶ 37, 39). Similarly, Plaintiff argues that it would
be absurd to imply that Woodward's actions to "convince the company to at least make the
independent operators 'statutory employees'" was not directed at Woodward's superiors,
"presumably, the CEO and/or the Board." *Id.* at 26 (quoting Doc. 56 ¶ 45). The Court notes
that Plaintiff attached a 10-K and excerpts of Flowers' SEC filings indicating the roles of the
individual Defendants during Woodward's employment and during the Class Period. (Docs.
63-2, 63-6 through 63-10.) In relevant part, the SEC filings indicate that:

- Allen Shiver was Executive Vice President of Flowers Bakeries from 1998 to
  2002, President and COO of the Warehouse Segment from 2003 to 2008,
  President of Flowers from 2010 to 2013, and has been President and CEO of
  Flowers since May 2013 (s*ee, e.g.*, Doc. 63-2 at 19);

- R. Steve Kinsey was Tax Director of Flowers Foods from 2001 until 2002, was
  Vice President and Corporate Controller of Flowers from 2003 until 2007, was
  Senior Vice President and CFO of Flowers from 2007 to 2008, and has been
  Executive Vice President and CFO of Flowers since 2008 (*id.*);

- Karyl Lauder was a Division Controller for Flowers Bakeries from 1997 to 2003,
  Vice President and Operations Controller of Flowers from 2003 to 2007, Vice
  President and CAO from 2007 to 2008, and has been Senior Vice President and
  Chief Accounting Officer of Flowers Foods since May 2008 (*id.* at 20); and

- George E. Deese was President and COO of Flowers Bakeries from 1983 to
  2002, President and COO of Flowers from 2002 to 2004, CEO of Flowers from

2004 to 2013, and has been Chairman of the Board since 2013.  (Doc. 63-6 at 4.)[28]

Moreover, Plaintiff alleges and the SEC filings indicate that Kinsey succeeded Woodward as CFO in September 2007 and Lauder succeeded Woodward as CAO in September 2007.  *See* Doc. 56 ¶¶ 22, 23.  Plaintiff further argues that Defendant Kinsey reported to Woodward when Woodward learned of the potential adverse IRS ruling and that Defendants Kinsey and Lauder reported to Woodward when Woodward learned of the Jones Day opinion regarding Flowers' classification of independent distributors, and that they therefore knew of those adverse determinations.  (Doc. 63 at 18-19.)[29]  The Court finds that based on the circumstances alleged – including that Woodward was one of the top executives of Flowers as its CFO, that one of the Defendants (Deese) was the CEO when Woodward was CFO, that two of the Defendants (Kinsey and Lauder) directly succeeded Woodward (and appear to have reported to him), and that the final individual Defendant (Shiver) was an executive when Woodward was CFO and is the current CEO of Flowers – a reasonable person would infer that there was at least a fifty percent chance that the individual Defendants were aware of or severely reckless in not knowing during the Class Period the facts alleged by Woodward.

This is not such a case where Plaintiff's failure to allege details about Woodward's statements as to any individual Defendant, place, or date renders Woodward's statements completely unreliable.  *Cf. FindWhat*, 658 F.3d at 1304 (concluding that the "inference that the Plaintiffs' sources were wholly unable to remember even approximate dates for these events, despite recalling otherwise detailed content, is less strong than the inference that the Plaintiffs or their sources omitted such dates strategically after concluding that the information would

---

[28] The four individual Defendants are the first four signers of Flowers' 10-K for fiscal year 2015.  (Doc. 63-2 at 64.)

[29] The Court notes that this is not alleged in the Amended Complaint, but Plaintiff did allege that Woodward "joined Flowers in 1985 as a Tax Manager" and was then Senior Vice President before becoming Chief Financial Officer and Chief Accounting Officer.  (Doc. 56 ¶¶ 25, 38.)  Because Kinsey and Lauder appear to have been involved in the tax and accounting aspects of Flowers, it is reasonable to infer that they reported to Woodward when he was CFO.

not be helpful to their allegations") [30]; *Zucco Partners, LLC*, 552 F.3d at 996 (finding confidential witnesses' statements unreliable because they had only secondhand information). As CFO, Woodward was in a position to personally know the facts that he alleged and to alert the individual Defendants to his concerns. Further, Plaintiff has alleged that much of Woodward's testimony is under seal and that his allegations come from the unredacted portions of Woodward's testimony, which allows a reasonable inference that Plaintiff is not strategically avoiding providing more specific information. (Doc. 56 ¶ 37.) Moreover, "[w]hile omissions and ambiguities count against inferring scienter, the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 313.

Defendants further argue that Woodward's "common knowledge allegations" that Flowers and its directors and officers were "well aware" or "knew" that distributors were working more than forty hours per week without compensation for overtime are insufficient. (Doc. 62-1 at 24.) The Court agrees that, standing alone, these allegations would be insufficient to show scienter. But here, Woodward's statements were corroborated by independent investigation into Flowers' practices during the Class Period and the allegations contained in the distributor lawsuits. *See* Doc. 56 at 19-23.[31] Before publishing its memorandum analyzing Flowers' practices in January 2016, Littler Mendelson "independently reviewed documents and information shedding light on the Company's business model." *Id.* ¶ 50. Littler Mendelson found that "Flowers has full-time employees who regularly perform the same tasks as distributors," and that "distributors must often perform services 6 to 7 days per week." *Id.* at 20 -21. Plaintiff also alleged that according to a lawsuit filed by a Flowers distributor, that distributor worked seventy to eighty hours per week for Flowers. *Id.* ¶ 55. Thus, Woodward's allegations which are supported by similar facts alleged thereafter contribute to an inference of scienter.

---

[30] Here, the Eleventh Circuit found the allegations insufficient to prove scienter because the only dates that Plaintiffs pointed to as occasions where Defendants had knowledge of any falsity were *after* the allegedly false and misleading statements were made. *Id.* at 1300-04.

[31] Moreover, Plaintiff alleges that Woodward "repeatedly warned Flowers' senior management and board about the risks of classifying its distributors as independent contractors" and that Flowers was informed that the IRS was going to rule adversely regarding its classification of distributors as independent contractors. (Doc. 56 ¶¶ 37, 43.) Such allegations also provide support for any "common knowledge" allegations that Flowers knew it was misclassifying distributors.

Woodward was not just a "witness[] who disagreed with the individual defendant's management of the company." (Doc. 62-1 at 25-26) (citing *Fidel v. Rampell*, 20 Fla. L. Weekly Fed. D 841, 2005 U.S. Dist. 45321, at *13-14 (S.D. Fla. Mar. 29, 2005)). In *Fidel,* the court found that "nothing" about the confidential witnesses' allegations demonstrated that the individual defendant was aware of any of the facts the plaintiff alleged constituted fraud. *Id.* By contrast, here there is at least a fifty percent chance that the individual Defendants were informed of the risks of misclassifying distributors based on their roles at Flowers and their relationships to Woodward. Woodward's statements are further corroborated by numerous other allegations and reports described in the Amended Complaint. Thus, although all of Woodward's opinions may not be helpful, many of them are relevant as to Defendants' knowledge and Flowers' business practices and are reliable under the circumstances alleged by Plaintiff. Taken collectively with the other allegations in the Amended Complaint, Woodward's statements contribute to a strong inference of scienter.

### D. The Distributor Lawsuits

Defendants argue that the distributor lawsuits cannot establish scienter of any individual Defendant and that none of the lawsuits are alike. (Doc. 62-1 at 26.) Defendants assert that there has never been an adverse judgment against Flowers in any of these suits, and that the only court to issue a dispositive ruling on Flowers' classification of distributors held that distributors qualified as independent contractors, not employees. *Id.* at 27. (citing *W. Va. Baking Co.*, 299 NLRB No. 37, 20–21 (1990), *enforced sub nom. Chauffeurs, Teamsters, Warehousemen & Helpers, Local Union No. 175*, 946 F.2d 1563 (D.C. Cir. 1991)).[32] Defendants assert that this "leads to the more compelling inference that the Individual Defendants' had a good faith, reasonable basis for their statements related to distributor classification." *Id.*

The twenty-seven distributor lawsuits are relevant in the context of the other allegations of the Amended Complaint. Not only do the distributor lawsuits each corroborate Plaintiff's allegations regarding Flowers' misclassification of distributors, but they make it more likely that Flowers acted with severe recklessness in making various allegedly false and

---

[32] As Plaintiff argues, this case is not entitled to great weight in assessing Defendants' state of mind during the Class Period because it predates virtually all of the facts alleged in the Complaint as putting Defendants on notice of the potential and actual illegality of Flowers' classification of distributors.

misleading statements and omissions.  Thus, while they alone do not establish scienter, the distributor lawsuits may be considered in determining whether Plaintiff has adequately pled scienter.  *See Sapssov v. Health Mgmt. Assocs.*, 608 F. App'x 855, 861 (11th Cir. 2015) (agreeing with district court that allegations including "'the amount and widespread nature of the fraud, the allegations in the Meyer [whistleblower] action, and the investigation by the OIG . . . when viewed holistically, create a strong inference of scienter'") (citation omitted).

When scienter is found not to have been sufficiently pled, it is usually because the allegations are vague, conclusory and without support, and generally fail to indicate that the defendants acted with an intent to defraud or with severe recklessness.  *Cf. Mizzaro*, 544 F.3d at 1254 (finding scienter not sufficiently alleged because the allegations would not cause a reasonable person to infer fraudulent intent); *Kadel v. Flood*, 427 F. Appx. 778, 780-81 (11th Cir. 2011) (finding scienter not sufficiently compelling where plaintiffs "omit[ted] any facts that would require one to rule out an innocent explanation for the alleged behavior" and where defendants provided "myriad warnings and other cautionary statements, which significantly undermine[d] any inference that appellees intended to mislead [] investors").  Here, Plaintiff pointed to numerous reports, statements, legal opinions, and government actions in alleging that Defendants acted with scienter in making false and misleading statements and omissions. Taken together, these allegations are sufficient to raise a strong inference that Defendants acted with severe recklessness as to the falsity of their statements and omissions.  Because Flowers' state of mind is imputed by the state of mind of its agents, the Court finds that Plaintiff has also adequately alleged scienter as to Flowers.  *Mizzaro*, 544 F.3d at 1254.  Even if Defendants believed their conduct was merely a creative or "aggressive interpretation of, but not a breach of, the [law]," the Court finds that given the nature of the lawsuits and the role the DSD model has at Flowers, the allegations create at least an equally strong inference that the danger of misleading investors was "so obvious" that defendants "must have been aware of it."  *Special Situations Fund*, 775 F. Supp. 2d at 242.  Thus, although Defendants have pointed to some plausible non-culpable explanations for their conduct, the Court finds that Plaintiff's allegations would cause a reasonable person to "deem the inference of scienter at least as strong as any opposing inference[.]" *Tellabs*, 551 U.S. at 326.  Moreover, determinations

of the reasonableness of a defendant's beliefs and actions "are fact-intensive inquiries, [that] are generally not properly resolved on motions to dismiss." *In re Friedman's*, 385 F. Supp. 2d at 1369. As such, the Court finds that Plaintiff adequately pleads scienter in the Amended Complaint.

### IV.   Pleading of Loss Causation

Plaintiff must also plead loss causation, meaning "a causal connection between the material misrepresentation and the [economic] loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). This requires showing that "the defendant's fraud [was] both the but-for and proximate cause of the plaintiff's later losses." *FindWhat*, 658 F.3d at 1309. But "plaintiff need not show that the defendant's misconduct was the 'sole and exclusive cause' of his injury;' only that it was "a 'substantial' or 'significant contributing cause.'" *Id.* (citation omitted). Because an efficient market translates all available information into the stock price, "[a] 'fraud on the market' occurs when a material misrepresentation is knowingly disseminated to an informationally efficient market." *Id.* at 1310. In fraud on the market cases, such as this one, the key question for determining loss causation is: "even if the plaintiffs paid an inflated price for the stock as a result of the fraud (i.e., even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?" *FindWhat*, 658 F.3d at 1312.[33]

Plaintiffs often allege loss causation by asserting that a defendant's corrective disclosure revealed that a prior statement was false and that the revelation caused the stock price to drop. *FindWhat*, 658 F.3d at 1311-12; *In re Williams Sec. Litig. - WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009) ("Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops . . . ."). In such case, Plaintiffs "need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace 'through a series of partial disclosures.'" *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013) (citation omitted). Some courts have also found

---

[33] It does not appear that the pleading of loss causation is subject to heightened pleading requirements. *Dura*, 544 U.S. at 346 ("[W]e assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss."); *In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1347 (N.D. Ga. 2012) ("Loss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA.")

that "[i]t is sufficient to show that a risk defendants allegedly concealed materialized and arguably caused the plaintiffs' losses." *In re Jiangbo Pharm., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1264-65 (S.D. Fla. 2012); *Meyer*, 710 F.3d at 1197 n.8. The key is that plaintiffs allege that a concealed truth became known, or a concealed risk materialized, and caused economic loss for the plaintiffs. *See Dura*, 544 U.S. at 347 (finding complaint insufficient because it "fail[ed] to claim that Dura's share price fell significantly after the truth became known").

Defendants argue that because Plaintiff's "alleged corrective statement does not 'identify, reveal, or correct any prior misstatement, omission or improper [] practice,' there is no corrective disclosure and the Complaint should be dismissed." (Doc. 62-1) (quoting *Durham v. Whitney Info. Network, Inc.*, No. 06-CV-00687, 2009 U.S. Dist. LEXIS 113757, at *57 2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) (citation omitted). Defendants assert that the announcement of the DOL compliance review was not a corrective disclosure. (Doc. 62-1 at 41) (citing *Sapssov*, 608 F. App'x at 863) ("Revelation of the OIG investigation . . . does not show any actual wrongdoing and cannot qualify as a corrective disclosure."). Defendants also assert that none of their August 2016 statements constitute corrective disclosures because they do not address the same subject or indicate falsity of any prior allegedly false statements on distributor classification, but only release negative financial results. *Id.* at 44 ("[D]isappointing earnings do not establish loss causation.") (citing *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex. 2008)). Defendants' final argument on this point is that analysts and news reports of public information regarding the DOL review and lawsuits cannot establish loss causation because they do not "reveal[] any new information to the market." *Id.* at 44-45.

Plaintiff responds that "Defendants made positive statements concerning Flowers' continued growth with controlled labor costs, but failed to disclose the Company's existential risk faced by its misclassification of distributors, including total liability in excess of $1 billion." (Doc. 63 at 42) (citing Doc. 56 ¶ 312). Plaintiff argues that subsequent partial disclosures such as Flowers "revealing" that "'performance in the company's direct-store-delivery (DSD) segment was offset by higher marketing expense'" led to Flowers' stock price dropping. (Doc. 63 at 43) (citing Doc. 56 ¶ 313). Plaintiff alleges that as Defendants "attempted to defend the distributor model," analysts discussed the problems posed by the model, causing the risk to

35

partially materialize into dropped stock prices. *Id.* Plaintiff argues that after the DOL announced that it would conduct a compliance review of Flowers, analysts discussed the growing legal expense of the distributors lawsuits, and Shiver admitted that "he was not surprised by the DOL review," Flowers' stock price fell again on unusually heavy trading volume "[a]s the full extent of concealed risks from Flowers' distributor misclassification was revealed and absorbed." *Id.* (citing Doc. 56 ¶¶ 325-26). Plaintiff argues that he has alleged loss causation based on theories of corrective disclosure and materialized risk by alleging that "the price of the Company's securities significantly declined when the misrepresentations made to the market — and/or the information alleged herein to have been concealed from the market — and the effects thereof, were revealed, causing investors' losses." *Id.* at 44 (citing Doc. 56 ¶ 310).[34] Plaintiff argues that "[t]he timing and magnitude of Flowers stock price declines negate any inference that the loss suffered by Plaintiff and the Class was caused by" any factors "unrelated to Defendants' fraudulent conduct." *Id.*

The Court has already found that Plaintiff sufficiently alleges that Defendants made misleading statements throughout the Class Period. Defendants also appear to concede that Plaintiff sufficiently alleges that the Class purchased stock at prices that subsequently dropped. The only apparent dispute is whether corrective disclosures were made revealing the falsity of prior statements or the materialization of a concealed risk concerning the classification of distributors, and whether such disclosures caused the Class losses.

As the Eleventh Circuit has held, a "corrective disclosure" is a "release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *FindWhat*, 658 F.3d at 1311. To be clear, "a corrective disclosure can come from any source, and can 'take any form from which the market can absorb the information and react' . . . so long as it 'reveal[s] to the market the falsity' of the prior misstatements." *Id.* at 1311 n.28 (citations omitted).[35] But, "the disclosure must share the same subject matter as

---

[34] Indeed, Plaintiff many times alleges in the Complaint that the Company concealed the "risk" that liability for its misclassification of distributors could meet or exceed $1 billion, among other "risks." *See*, *e.g.*, Doc. 56 at 83, 84, 93 ¶ 219, 96, & 101 ¶ 229.

[35] "[T]he market may learn of possible fraud from a number of sources: e.g., from whistleblowers [sic], analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in

the prior misstatement; only then can the disclosure be said to have a '*corrective* effect,' rather than merely a '*negative* effect.'" *Id.* (citation omitted). Plaintiff must also adequately allege that the lower stock price was caused, at least in significant part, by the revealed misrepresentations. *Dura*, 544 U.S. at 342-43.

Here, corrective disclosures are alleged to have come from Defendants themselves, analysts, news reports, and the DOL. The August 10, 2016 disclosures discussed that the DOL had just announced that it intended to conduct a compliance review of Flowers under FLSA, that the DOL had brought at least two cases against companies related to misclassification of employees as independent contractors, that Flowers was facing nearly two dozen lawsuits alleging independent contractors were being misclassified, and that if the DOL found Flowers in violation of FLSA, its liability could top $1 billion. (Doc. 56 ¶¶ 6-7.) The same day, Flowers' press release stated that its revenue was lower than projected and stated that it was lowering its fiscal 2016 outlook "[d]ue to increased activity and weak category volumes." *Id.* ¶ 9. Plaintiff alleges that Flowers' stock price fell 9% that day, "on unusually heavy trading volume." *Id.* at 136 ¶ 291. On a conference call on August 11, 2016, Defendant Shiver stated: "It's not a surprise that the DOL" was conducting a compliance review because "they have heightened attention in this whole topic." *Id.* ¶ 294. Defendant Kinsey stated that costs were up due to "higher workforce-related costs, consulting and legal costs" and that "a contributing factor to DSD margins was increased legal expense and higher corporate overhead charges." *Id.* ¶ 295. An analyst also asked that considering the company's poor results over the last three years, why should investors have confidence that things would improve since "competition's heating up even more" and "there are some legal issues with your business model." *Id.* ¶ 296. Defendant Shiver responded that the Company has acquired a lot of companies and that "[n]ow the focus is on really settling down the business, looking at our business model and making sure that we're focused on not only growing the top line but also on margin improvement." *Id.* Plaintiff alleges that Flowers' stock price fell 7.4% that day, "on unusually heavy trading volume." *Id.* ¶ 297. Plaintiff further alleges that a BMO

---

accounting treatment going forward, newspapers and journals, etc." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 297 n.18 (D.N.J. 2007) (citation omitted).

Capital Markets report stated on October 20, 2016 that Flowers "reiterated its confidence in resolving outstanding legal issues without a material impact on its earnings and operations." *Id.* ¶ 298. Plaintiff alleges that Flowers responded in its Form 8-K filed with the SEC on October 21, 2016 that the report "does not reflect the Company's position on its outstanding lawsuits. . . . Given the stage of the complaints and the claims and issues presented, the Company cannot reasonably estimate at this time the possible loss or range of loss, if any, that may arise from the unresolved lawsuits." *Id.*[36]

The Court finds that at least some of the alleged disclosures were "corrective" in that they collectively revealed that Flowers' prior statements about its classification of distributors were misleading. Disclosures need not address the prior misstatements specifically or fact-for-fact as long as they "share the same subject" as the prior misstatements. *FindWhat*, 658 F.3d at 1311 n.28; *Meyer*, 710 F.3d at 1197 ("A disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation."). Flowers is alleged to have previously indicated that it was materially compliant with the law, that the lawsuits had no merit, and that Flowers was successful largely due to its DSD model which kept costs low. Many of the alleged corrective disclosures provided new information indicating that such statements were false or misleading when made. Unlike in the Eleventh Circuit case cited by Defendants, the analysts did not merely "repackage[]" information that "had been public for months." *Meyer*, 710 F.3d at 1199-1200; *Sapssov*, 608 F. App'x at 864 (finding an analyst's report inadequate because it summarized facts from information that had been publicly available for three months). The analysts and news reports either discussed newly-public information or provided their own new information, such as that liability for Flowers could reach $1 billion if the DOL found it in violation of FLSA. *Thorpe*, 111 F. Supp. 3d at 1382 (finding that analysts' reports "strengthen the inference that the disclosure revealed a truth to the market").

Moreover, although "the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure," it may qualify as a partial corrective

---

[36] Plaintiff also alleges that numerous other statements Defendants made during the Class Period "constituted a partial disclosure of the truth," which caused the stock price to drop but not as much as it would have if the full truth had been revealed. *See, e.g.*, Doc. 56 ¶¶ 314-321.

disclosure when "coupled with a later finding of fraud or wrongdoing." *Meyer*, 710 F.3d at 1201 & n.13. This is because "[t]he announcement of an investigation reveals just that—an investigation—and nothing more." *Id.* at 1201. Here, Plaintiff's other allegations, including the allegation that Flowers stated in October 2016 that it could not reasonably estimate the possible loss it was facing from the lawsuits, could reasonably indicate that Flowers had committed fraud or similar wrongdoing. *See Thorpe*, 111 F. Supp. 3d at 1382 (finding that a "disclosure relating to the outcome of the . . . investigation coupled with the analysts' reports amount to a corrective disclosure and supports a finding of loss causation"). Plaintiff need not allege "an express admission of fraud; indeed, . . . 'the relevant truth concealed by the defendant's misrepresentations may be disclosed directly or indirectly.'" *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1369 (N.D. Ga. 2010) (citation omitted); *In re Elec. Data Sys. Corp. Secs. & "ERISA" Litig.*, 298 F. Supp. 2d 544, 560-61 (E.D. Tx. 2004) ("[D]efendants cannot escape liability for fraud simply by not admitting the fraud."). Unlike in cases where the complaint was dismissed for failure to adequately plead loss causation, Plaintiff's allegations are sufficiently detailed to provide Defendants with an "indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. Furthermore, because the stock prices dropped after the disclosures, Plaintiff has sufficiently alleged that the disclosures themselves caused the alleged losses, rather than other factors. *In re Jiangbo*, 884 F. Supp. 2d at 1265.[37] Accordingly, considering Plaintiff's allegations, the Court finds that Plaintiff has sufficiently alleged loss causation – that partial corrective disclosures revealed the falsity of Defendants' prior statements and caused Plaintiff's losses.

### V. Plaintiff's Secondary Liability Claim

Having found that Plaintiff sufficiently alleged a primary violation of Section 10(b), the Court finds that Plaintiff has also sufficiently alleged a secondary liability claim against the individual Defendants under Section 20(a).

---

[37] The Court notes that here, Plaintiff has further alleged that disclosure of the lawsuits challenging Flowers' classification of distributors also resulted in dropped stock prices (*see, e.g.*, Doc. 56 ¶¶ 248-257). *Cf. Sapssov*, 608 F. App'x at 864 (dismissing Complaint where the allegations showed that "the market disregarded" the whistleblower lawsuit).

**VI.  Defendants' Motion for Hearing**

The Court finds that the Parties' briefs and materials were sufficient for the Court to properly address the Motion to Dismiss.  Therefore, because a hearing on the Motion to Dismiss would be unnecessary, the Court **DENIES** Defendants' Motion for Hearing (Doc. 66).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. 62) is **GRANTED-IN-PART** and **DENIED-IN-PART**; Plaintiff's Motion to take Judicial Notice (Doc. 64) is **GRANTED**; and Defendants' unopposed Motion for Hearing on the Motion to Dismiss (Doc. 66) is **DENIED**.  Defendants' Motion to Dismiss (Doc. 62) is **GRANTED** as to Defendants' challenged statements on past financial data and their forward-looking statements made on or after April 25, 2015, as described herein, and **DENIED** as to all other claims.

The Parties will be noticed by separate order to confer and submit a proposed scheduling and discovery order.

**SO ORDERED**, this  23rd  day of March 2018.

**/s/ W. Louis Sands**
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**